**Lee Ann McKINNON and Darrell McKinnon, Plaintiffs,**

v.

**TAMBRANDS, INC., Defendant.**

No. 92–NC–035W.

United States District Court,
D. Utah, N.D.

March 3, 1993.

---

**416**

Joseph M. Bean, Bean & Smedley, Layton, UT, for plaintiffs.

Gary B. Ferguson, Williams & Hunt, Salt Lake City, UT, for defendant.

---

1. Defendant also moved the court for summary judgment on Plaintiff's failure to warn claims and on any claims brought by Mr. McKinnon. At the hearing, Plaintiff voluntarily dismissed her failure to warn claims and the court ruled that Utah law precludes any claims by Mr. McKinnon for personal injury to Plaintiff or for expenses or lost income connected therewith.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on the Motion for Summary Judgment brought by defendant Tambrands, Inc. ("Defendant") on the strict product liability claims of plaintiff Lee Ann McKinnon ("Plaintiff").[1] A hearing on the motion was held on February 3, 1993. Defendant was represented by Gary B. Ferguson. Plaintiff was represented by Joseph M. Bean. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. After the hearing, the court took the matter under advisement. Since that time, the court has further considered the law and the facts related to the motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND

Defendant manufactures tampons under the brand name of Tampax. In early July, 1989, Plaintiff purchased a box of Tampax Regular Tampons at a Smith's Food and Drug Center in Farmington, Utah. Shortly thereafter, Plaintiff and her husband, Darrell McKinnon, took a trip to Mexico. The McKinnons were in Mexico from July 7, 1989, through July 14, 1989. While in Mexico, Plaintiff used the tampons on three different occasions.

Shortly after returning from Mexico, Plaintiff began to feel ill. On Saturday, July 15, 1989, Plaintiff experienced body aches and fatigue. The following day, Plaintiff became nauseated and began to suffer from diarrhea. By Monday, July 17, 1989, Plaintiff's condition had deteriorated; she had a fever, her diarrhea had worsened, and she was becoming progressively weaker. Upon noting Plaintiff's condition, Mr. McKinnon

took her to see Dr. Dennis Roger Peterson ("Dr. Peterson").

Upon the completion of his examination, Dr. Peterson admitted Plaintiff to Lakeview Hospital (the "Hospital") in Bountiful, Utah. Dr. Peterson's admitting diagnosis was Toxic Shock Syndrome ("TSS").[2]

Plaintiff received in-patient care at the Hospital for the next two days. Though she did not experience complete recovery during her hospitalization, Plaintiff improved dramatically. Plaintiff was discharged on July 19, 1989. On July 27, 1989, the McKinnons went to Dr. Peterson's office for a follow-up evaluation of Plaintiff's condition. Following the visit, Plaintiff discarded the remaining tampons.

In the middle of February, 1991, Mr. McKinnon wrote a letter addressed to the C.E.O. of Tambrands. In this letter, Mr. McKinnon recounted the emotional and economic hardships that he and Plaintiff suffered as a result of Plaintiff's illness and asked Defendant to pay damages. In response, the McKinnons received a letter dated March 12, 1991, from Defendant's Assistant Treasurer, Martha B. Lindsay. After recounting several general statistics about TSS, the letter concluded: "If you submit a copy of your wife's unreimbursed costs and directly related expenses, we will be pleased to consider reimbursement."

In response to the March 12, 1991, letter from Ms. Lindsay, Mr. McKinnon prepared and sent a package of materials to Defendant on July 10, 1991. The package included a cover letter from Mr. McKinnon to Ms. Lindsay of that date, various forms and billing statements documenting loss of income and other expenses, and a letter from Dr. Peterson dated June 11, 1991, and addressed "To Whom It May Concern." The June 11, 1991, letter from Dr. Peterson certified that Dr. Peterson was Plaintiff's treating physician around July 17, 1989, and that Plaintiff "was

hospitalized and had treatment for what was thought to be a toxic shock episode...."

In early October of 1991, Plaintiff contacted Craig R. Nichols, the Director of the Bureau of Epidemiology for the State of Utah, to determine if he could confirm that she had experienced TSS. After reviewing medical records provided by Dr. Peterson, Mr. Nichols telephoned Plaintiff to convey his belief that she had suffered from TSS. On March 13, 1992, approximately five months after contacting Mr. Nichols, Plaintiff filed suit.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (majority opinion); *Gonzales v. Millers Casualty Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991).[3] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which

---

2. Dr. Peterson's office notes indicate "Possible [TSS]." Peterson Dep., Ex. 1, at 1. The Physician Admission Order Form filled out by Dr. Peterson lists as the admitting diagnosis "Observe for Toxic Shock Syndrome." *Id.*, Ex. 2, at 12. Dr. Peterson's deposition testimony confirms that his working and admitting diagnosis was TSS. *Id.* at 5.

3. The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

that party will bear the burden of proof at trial." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552).

In considering whether there exists a genuine issue of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[4] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D. Utah R. 202(b)(4).

## III. DISCUSSION

Defendant has moved this court for summary judgment on Plaintiff's product liability claims on the basis that Plaintiff's action is time barred by the statute of limitations. Plaintiff opposes the motion, arguing, in the alternative, that the statute of limitations had not expired when Plaintiff filed her complaint because she did not "discover" her cause of action until October of 1991, when she received official "confirmation" of her TSS episode, and that Defendant is estopped by its March 12, 1991 letter from asserting the statute of limitations as a defense. The Plaintiff's contentions are addressed in order.

4. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

5. Plaintiff testified that she continued to suffer ill effects for a substantial period of time after she was discharged from the Hospital. Lee Ann McKinnon Dep. at 12–17, 49–54. Plaintiff properly does not claim, however, that she cannot be held to have discovered the harm until the full extent of the harm had manifested itself. *See McHenry v. Utah Valley Hosp.*, 724 F.Supp. 835, 839 (D.Utah 1989), *aff'd*, 927 F.2d 1125 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 263, 116 L.Ed.2d 217 (1991) (" 'Discovery' does not

## A. "DISCOVERY"

Plaintiff's products liability claims are subject to the statute of limitations provision of the Utah Product Liability Act. *See* Utah Code Ann. § 78–15–3 (1992). Section 78–15–3 provides: "A civil action under this chapter shall be brought within two years from the time the individual who would be the claimant in such action discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." *Id.* By its plain language, the statute begins to run from the date the claimant *discovers*, or in the exercise of due diligence should have discovered, both the harm and its cause.

The court notes at the outset the majority rule that when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury. *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). Where the evidence is so clear that there is no genuine factual issue, however, the determination can be made as a matter of law. *See id.* at 1388. In the case at hand, the record demonstrates conclusively that Plaintiff discovered, or in the exercise of due diligence should have discovered, both her injury and its cause more than two years prior to the filing of her claim.

The record before the court establishes that Plaintiff discovered the harm (her physical illness) by July 17, 1989, at the latest, when she was hospitalized.[5] The record also establishes that she discovered the cause (TSS caused by Defendant's tampons) by July 27, 1989, at the latest, when she saw Dr. Peterson for a follow-up examination.[6]

mean that plaintiff must realize the full extent of his injury.").

6. It is unclear whether Dr. Peterson informed Plaintiff prior to July 27, 1989, that he was of the opinion that she suffered from TSS as a result of tampon usage. On the one hand, Dr. Peterson testified that his working diagnosis during the period of Plaintiff's hospitalization was TSS, and that although he did not recall informing Plaintiff of that diagnosis, it was his typical practice to do so, and he can recall no reason why he would not have done so in this case. Peterson Dep. at 5–6. In addition, according to Mr. McKinnon's best recollection, Dr. Peterson first informed Mr. McKinnon of his working diagnosis upon the completion of his examination of Plaintiff on July

Plaintiff admits in her deposition that at the July 27, 1989 examination, Dr. Peterson "told [her] that in his opinion [she] had toxic shock and to never use tampons again." Lee Ann McKinnon Dep. at 16–17. In accord with Plaintiff's testimony, Mr. McKinnon testified that he was present at the July 27, 1989 examination and that "[Dr. Peterson] told [Plaintiff] that she had had toxic shock and asked her not to use tampons and to discard them." Darrell McKinnon Dep. at 10–11. Although Dr. Peterson does not specifically recall advising Plaintiff to refrain from using tampons and to discard the remaining tampons, he acknowledges that normally he would make such a statement to a patient that he suspected to have TSS secondary to tampon usage.[7] Peterson Dep. at 13–14.

In addition to Dr. Peterson's statement that Plaintiff had TSS and to never use tampons again, Plaintiff had knowledge prior to July 1989 that TSS was associated with tampon usage. Plaintiff testified that she knew prior to that date that women had died of TSS and that the likely cause of the TSS in those cases was the use of tampons. Lee Ann McKinnon Dep. at 43.

Plaintiff argues, however, that the fact that Dr. Peterson told her that he was of the opinion that she had TSS as the result of tampon usage is insufficient to constitute "discovery" of the cause of her illness for the purpose of triggering the statute of limitations.[8] Instead, Plaintiff argues that to constitute "discovery" she must have received

---

17, 1989. Darrell McKinnon Dep. at 9. On the other hand Plaintiff's testimony is unclear. At one point in her deposition, she testified that Dr. Peterson first informed her that he thought she had TSS at the July 27, 1989, follow-up examination. Lee Ann McKinnon Dep. at 16–17. At another point in her deposition, she indicated that she had been told that she was being admitted to the Hospital due to TSS. Id. at 29. Whether Dr. Peterson informed Plaintiff of his working diagnosis during the period of her hospitalization is immaterial, however, because the evidence is uncontradicted that he so informed Plaintiff when she returned for her follow-up visit two weeks later.

7. At the time of the July 27, 1989 examination, Dr. Peterson was of the opinion that Plaintiff suffered from TSS and that Plaintiff's usage of the tampons was the likely cause. Dr. Peterson testified that, from the time Plaintiff was discharged from the Hospital until the date of his testimony, he was of the opinion that Plaintiff had contracted TSS. Peterson Dep. at 10–11. His working diagnosis of Plaintiff was TSS, id. at 5, and he treated Plaintiff as if she had TSS. Id. at 11. Dr. Peterson also believed that the TSS was probably due to tampon use. Id. at 14.

In his deposition testimony and in his discharge diagnosis, Dr. Peterson qualified his opinion on the nature of Plaintiff's illness by pointing out that Plaintiff had not exhibited every symptom necessary for a textbook diagnosis. Dr. Peterson explained that two of the criteria listed by the Center for Disease Control ("CDC") in 1988 for the diagnosis of TSS, diffuse macular erythroderma (rash) and high systolic blood pressure less than 90 millimeters of mercury, were absent in Plaintiff's case. Id. at 10. The absence of these criteria, specifically a rash, detracted from how firmly he could state that Plaintiff had TSS. Id. As a result, he equivocated in his discharge diagnosis of Plaintiff, id., and he was unwilling to characterize his opinion as a "reasonable medical probability." Id. at 18. Nonetheless, Dr.

Peterson explained that the absence of the two CDC criteria did not preclude a conclusion in his mind that Plaintiff had TSS because the CDC definition was used for statistical purposes to allow absolute clarity in evaluating the incidence of TSS and the responsiveness of the corresponding treatment. Id. at 11. In practice, however, it is very common to have an imperfect manifestation of the disease. Id. Therefore, based on the above and on his examination and treatment of Plaintiff, Dr. Peterson believed at the time of Plaintiff's discharge that Plaintiff had "Toxic Shock Syndrome that did not manifest all of the criteria in the literature." Id. at 10.

Although Dr. Peterson testified that he never told the McKinnons that he was absolutely sure that Plaintiff had TSS, Peterson Dep. at 19, there is no evidence in the record that he expressed any doubts about his diagnosis to the McKinnons. Indeed, Plaintiff testified that as far as she knew, Dr. Peterson did not at any time change his opinion that she had TSS in July of 1989. Lee Ann McKinnon Dep. at 18. Similarly, Mr. McKinnon testified that Dr. Peterson's statement was definite. Mr. McKinnon took issue in his deposition with the wording of Dr. Peterson's June 11, 1991 letter, which stated the Plaintiff had received treatment for "what was thought to be a toxic shock episode" because Dr. Peterson had been more definite in his statement to them about Plaintiff's condition. Darrell McKinnon Dep. at 12, 20.

8. Plaintiff appears at one point to argue for the application of the discovery rule to toll the statute of limitations. Pls.' Mem. Opp'n Def.'s Mots. Summ.J. & Partial Summ.J. at 7. The discovery rule, under Utah law, provides that a cause of action does not accrue until the plaintiff either knew or should have known the facts that give rise to the cause of action. See Klinger v. Kightly, 791 P.2d 868, 869 (Utah 1990); Brigham Young University v. Paulsen Constr. Co., 744 P.2d 1370, 1374 (Utah 1987); Maughan v. SW Servicing,

what amounts to a "confirmed diagnosis." Plaintiff argues that prior to receiving a "confirmation" from the Bureau of Epidemiology, she could only speculate as to the injury and the cause.

Notwithstanding Plaintiff's contention that absent a confirmation from the Bureau of Epidemiology her level of knowledge amounted only to "speculation," her actions following her release from the Hospital demonstrate that she felt relatively certain that the cause of her illness was TSS due to her use of Defendant's tampons. Subsequent to the examination, Plaintiff discarded the remaining unused tampons. Lee Ann McKinnon Dep. at 35–36. In addition, immediately following the examination, Plaintiff told no less than four family members and one friend that she had TSS. Specifically, Plaintiff told her mother, Ann Ona Youngdell; two sisters, Lori Hamby and Lisa Gandy; a sister-in-law, Linda Youngdell; and a friend, Becky Cano. *Id.* at 18–20. Plaintiff informed these individuals that she had suffered from TSS at the time "when [she] was told" by Dr. Peterson. *Id.* at 19–20.

Moreover, Plaintiff never expressed any reservations about seeking reimbursement from Defendant that were grounded in doubt about the cause of her illness. According to Plaintiff, the McKinnons first discussed the possibility of requesting reimbursement from Defendant or filing a civil action against Defendant between July of 1990 and July of 1991. *Id.* at 23–24. At that time, Plaintiff expressed displeasure at the thought of pursuing a claim against Defendant because she wanted to put the experience behind her and resume her life. *Id.* at 24–25. Significantly, Plaintiff's deposition testimony shows that at no time from July 1989 to the date of her deposition did she believe that her illness was anything other than TSS.[9] Lee Ann McKinnon Dep. at 54.

Plaintiff has not cited any authority in support of her contention that she needed a greater level of knowledge than she possessed on July 27, 1989 before she can be held to have "discovered" the cause of her injury. Moreover, Utah caselaw suggests that a level of knowledge less than that argued for by Plaintiff would constitute "discovery" under section 78–15–3.

Under Utah law, the general rule is that a cause of action accrues upon the happening of the last event necessary to complete the cause of action, regardless of the plaintiff's ignorance of the existence of a cause of action. *Myers v. McDonald,* 635 P.2d 84, 86 (Utah 1981); *see also Warren v. Provo City Corp.,* 838 P.2d 1125, 1129 (Utah 1992). The harshness of the general rule is ameliorated by the application of the discovery rule in three sets of circumstances: (1) where the discovery rule is incorporated into the language of the statute; (2) where the defendant has concealed facts or misled the plaintiff; and (3) where there are exceptional circumstances that would make application of the general rule irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action *Warren,* 838 P.2d at 1129. Mere *awareness* by the plaintiff of the facts upon which a claim *could* be brought, however, is sufficient to preclude the court's application of "exceptional circumstances" version of the discovery rule. In every case where a plaintiff was aware, or should have been aware, of the facts upon which a claim could have been brought but yet did not bring the claim prior to the expiration of the applicable statute of limitations, the Utah Supreme Court has

Inc., 758 F.2d 1381, 1387 (10th Cir.1985). Utah courts have applied the discovery rule in certain cases to vitiate the harshness of Utah's general rule that a cause of action accrues on the happening of the last event necessary to complete the cause of action, regardless of whether the plaintiff is aware of the existence of the cause of action. *See Klinger* at 869; *Brigham Young University* at 1373–74; *Becton Dickinson & Co. v. Reese,* 668 P.2d 1254 (Utah 1983); *Maughan,* 758 F.2d at 1384. The applicability of the discovery rule is not at issue in the instant case, however, as the discovery rule is incorporated into the statute itself. *See* Utah Code Ann. § 78–15–3 (1992). The issue, therefore, is when did Plaintiff "discover," or when should Plaintiff have discovered, both the harm and its cause.

9. Plaintiff's testimony is substantiated by that of her husband, who testified that no one told him between July of 1989 and the time that the action was filed that Plaintiff suffered from any condition other than TSS. Darrell McKinnon Dep. at 47–48.

held the action time-barred. *O'Neal v. Division of Family Serv.*, 821 P.2d 1139, 1144 (Utah 1991); *see also Warren*, 838 P.2d at 1129 (refusing to apply exceptional circumstances version of discovery rule because facts put plaintiff "on notice" that defendant might be liable); *Atwood v. Sturm, Ruger, & Co.*, 823 P.2d 1064, 1065 (Utah 1992).

In *Atwood*, the plaintiff was injured when a handgun, manufactured by the defendant, fell from his holster, struck the running board of his truck, and discharged. *Atwood*, 823 P.2d at 1064. Just months before the applicable statute of limitation had run, the plaintiff learned for the first time that he might have a legal claim against the defendant when he was informed by his attorney, whom he had consulted on another matter, that the defendant had recalled pistols of the type that injured the plaintiff due to manufacturing defects. *Id.* By analogy to cases decided under Utah's medical malpractice statute of limitations, the plaintiff argued that the negligence of the defendant was an essential element of his cause of action, and that he had no knowledge or even suspicion of any negligence until he was informed of the defendant's recall. *Id.* at 1064–65.

The *Atwood* court refused to apply the discovery rule, explaining that "the discovery rule does not apply to a plaintiff who becomes *aware* of his injuries or damages and a *possible* cause of action before the statute of limitations expires." *Id.* at 1065 (emphasis added). The court pointed out that the plaintiff knew of both his injury and the possibility of a cause of action prior to the expiration of the statutory period.

The Utah court's holdings that the mere awareness of the facts upon which a claim could be brought precludes application of the "exceptional circumstances" version of the discovery rule supports the conclusion that the level of knowledge sufficient to constitute "discovery" under section 78–15–3 is less than that argued for by Plaintiff. In the instant case, Plaintiff clearly was "aware" by July 27, 1989 that she had been injured and that Defendant's product had been identified as the likely cause. Under this state of facts, Plaintiff was alerted to a possible cause of action and could have brought a civil action against Defendant and began discovery into the question of the design of Defendant's product prior to the expiration of the two-year period provided for by section 78–15–3.

Even if plaintiff did not have the requisite level of knowledge to constitute "discovery" of the cause of her illness, section 78–15–3 required her to exercise due diligence to discover the cause of her illness. Utah Code Ann. § 78–15–3 (1992). If Plaintiff had any doubt regarding Dr. Peterson's working diagnosis of TSS, due diligence would have required her to seek confirmation of that diagnosis long before she contacted Craig Nichols at the Bureau of Epidemiology some twenty-six to twenty-seven months after Dr. Peterson first informed her of that diagnosis. Although this court is very sympathetic to the obvious suffering endured by Plaintiff and her family, to hold that Plaintiff did not "discover," or was not required by due diligence to discover, the cause of her injury until she received a confirmation of that diagnosis from the Bureau of Epidemiology would render section 78–15–3 essentially meaningless.

## B. ESTOPPEL

Plaintiff next argues that Defendant is estopped from asserting the statute of limitations as a defense. Plaintiff points to the March 12, 1991, letter signed by Defendant's Assistant Treasurer, Martha B. Lindsay (the "Lindsay Letter"), claiming that the letter's content and Defendant's failure to expressly deny liability prior to the expiration of the statute of limitations amounted to "negotiations with plaintiffs implying both liability and the necessity for reimbursement for damages."

■ Plaintiff's argument is without merit. As set forth by the Utah Supreme Court, Utah law concerning estoppel requires proof of "reasonable action or inaction by the [party claiming estoppel] taken or not taken on the basis of the [opposing] party's statement, admission, act, or failure to act." *CECO v. Concrete Specialists, Inc.*, 772 P.2d 967, 969

(Utah 1989).[10]  In other words, the party claiming estoppel must show (1) that it acted or failed to act "on the basis" of the opposing party's conduct, and (2) that its action or inaction was reasonable under the circumstances.  In the case at hand, Plaintiff has failed to make a showing sufficient to sustain these two requirements under the undisputed evidence in this case.

■  First, Plaintiff has provided no evidence that she relied on the Defendant's conduct in not filing her claim within the statutory period.  Indeed, the record demonstrates that it was Mr. McKinnon who caused the Complaint to be filed and that Plaintiff resisted Mr. McKinnon's efforts to pursue a claim against Defendant because she wished to put the experience behind her.[11]

Second, even if Plaintiff had relied on Defendant's conduct in delaying her action, such reliance was unreasonable under the circumstances.  In all but two cases in which Utah courts have denied summary judgment on the basis that the defendants were estopped

from asserting the statute of limitations as a defense, the plaintiff alleged the defendant made false representations or concealed material facts.[12]  Plaintiff makes no such allegations in the case at hand.  Furthermore, Defendant's actions in the instant case do not rise to the level of that alleged by the plaintiff in the. one case in which misrepresentation or concealment was not an issue.

In Rice v. Granite School District, 23 Utah 2d 22, 456 P.2d 159 (1969), the Utah Supreme Court held the defendant was estopped by its conduct from relying on the statute of limitations as a defense.  Id., 456 P.2d at 163.  In Rice, the plaintiff fell from a bleacher maintained by the defendant school district.  Immediately following the accident the plaintiff notified the authorities of Cyprus High School.  Over the course of the two years following the accident, an insurance adjuster employed by the defendant's insurance carrier communicated with her at least three times.  On each occasion, the adjuster assured her that the insurance company would

---

10.  CECO establishes the elements of equitable estoppel as:
    (i) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted;
    (ii) reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act, or failure to act; and
    (iii) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.
    CECO, 772 P.2d at 969–70.

11.  The relevant deposition testimony provides:
    Q:  Okay.  Who between you and your husband raised the subject of making claim against Tambrands?
    A:  My husband.
    Q:  And what did he say to you about it?
    A:  He said we ought to write to Tambrands and tell what happened.
    Q:  And what did you say?
    A:  [pause]
    Q:  Did you agree?
    A:  No.
    Q:  Why didn't you agree?
    A:  Because it has been very difficult for me to even have gone through this and I just wanted it behind me.

    Q:  Do you recall at all what your husband said, other than that he was considering pursuing a claim against Tambrands?

    A:  No.
    Q:  Did you tell him that you weren't happy about doing that?
    A:  Yes.
    Q:  And what was your reason for not being happy about going after Tambrands or pursuing a claim against Tambrands?
    A:  I just felt like that things that had been done had been done and that I just wanted to pick our lives back up and get on our feet again.
    Lee. Ann McKinnon Dep. at 21–22, 24–25.

12.  See e.g., Forsman v. Forsman, 779 P.2d 218, 219 (Utah 1989) (plaintiff alleged agent for the state erroneously told her that person driving vehicle which collided with her was not state employee); Vincent v. Salt Lake County, 583 P.2d 105, 106–07 (Utah 1978) (plaintiff alleged agent for county falsely represented that county pipe was not possible cause of damage to plaintiff's property); Butcher v. Gilroy, 744 P.2d 311, 312 (Utah Ct.App.1987) (plaintiffs alleged defendant concealed fact he sold property that was subject to stipulated settlement); see also Vest v. Bossard, 700 F.2d 600, 600 (10th Cir.1983) (plaintiff alleged defendants concealed fact they conspired to falsely charge him with sodomy).

compensate her for her injuries, pending only her release by her doctor and the ascertainment of the costs of her medical treatment. *Id.* at 161. On at least one of those occasions, the adjuster showed her pictures of the bleachers and commented that they were old and obsolete and there would be absolutely no problem in taking care of her expenses. *Id.* Based on these facts, the court held the defendant was estopped from relying on the applicable one-year statute of limitations. *Id.* at 164.

Similarly, in *Whitaker v. Salt Lake City Corp.*, 522 P.2d 1252, 1253 (Utah 1974), the court denied summary judgment against the plaintiffs ruling that an issue of material fact existed regarding whether the defendant was estopped from asserting the statute of limitations as a defense. In *Whitaker*, the plaintiffs sued to recover damages suffered by a minor during the cave-in of a city-owned clay bank. The plaintiffs hired an attorney who commenced negotiations with the city and its insurance carrier. The plaintiffs' attorney alleged that during the course of the negotiations, the adjuster for the city's insurance carrier and the attorney for the city assured him that the city and its carrier would compensate plaintiffs within the policy limits, but that the medical reports would be required first. *Id.* at 1252-53. The medical reports were then allegedly delayed by the city attorney and the insurance adjuster. *Id.* As a result of the alleged assurances, plaintiffs did not file suit within the statutory period. Based on the holding in *Rice*, the court denied summary judgment. *Id.* at 1253.

The conduct relied on by Plaintiff in her claim of estoppel is of an entirely different character from that alleged in *Rice* and *Whitaker*. The content of the Lindsay Letter did not reasonably justify Plaintiff in delaying her suit. The introductory paragraph states that Mr. McKinnon's February 1991 letter requesting reimbursement from Defendant had been referred to the undersigned, Martha B. Lindsay, for attention and that "[w]e are very sorry to learn about your wife's illness." The body of the letter recounts several general statistics about the occurrence and suspected causes of TSS. The concluding sentence provides: "If you

submit a copy of your wife's unreimbursed costs and directly related expenses, we will be pleased to consider reimbursement." Only this last sentence contains any sort of statement relating to Defendant's position on Plaintiff's claim. Unlike *Rice* and *Whitaker*, however, it contained no admission of liability and made no promise to pay. Instead, it only promised to "consider reimbursement" of Plaintiff's "unreimbursed expenses." Such a statement, by itself, does not provide a reasonable basis for delaying a civil action beyond the expiration of the statute of limitations.

The fact that Defendant never expressly denied liability is likewise insufficient to justify Plaintiff's delay in the absence of some evidence that Defendant led Plaintiff to believe that it was accepting liability. As discussed above, the Lindsay Letter does not admit liability or promise to pay Plaintiff's damages, and Plaintiff provides no evidence of any other communications or conduct whereby Defendant assumed liability or offered to pay.

On the whole, the Lindsay Letter is a neutral communication from Defendant to Plaintiff requesting additional information. A holding that such a communication, by itself, is sufficient to estop a party from relying on the statute of limitations would discourage any communication between aggrieved parties except a flat denial of liability. A neutral exchange of information without a formal admission or denial of liability, often facilitates informal resolutions of disputes: a process this court encourages.

Based on the forgoing discussion,

IT IS HEREBY ORDERED that:

1. Defendant Tambrands, Inc.'s Motion for Summary Judgment on Plaintiff Lee Ann McKinnon's strict product liability claims is granted.

2. Defendant's counsel is to prepare an appropriate judgment based on this Memorandum Decision and Order.