**Scott McCOLLIN and Karen McCollin, Plaintiffs,**

v.

**SYNTHES INC., and Danek Medical, Inc., Defendants.**

No. 2:95CV1097C.

United States District Court, D. Utah, Central Division.

May 27, 1999.

---

James C. Lewis, Salt Lake City, UT, for plaintiffs.

R. Scott Williams, Salt Lake City, UT, for defendants.

## ORDER

CAMPBELL, District Judge.

This matter comes before the court on defendants' motions for summary judgment, defendants' motion in limine to exclude plaintiff's experts, and plaintiff[1] Scott McCollin's motion to reinstate his fraud on the FDA claim. The court conducted hearing on these motions on April 1, 1999, at which plaintiff was represented by Donna Cummings, defendant Synthes, Inc. was represented by R. Scott Williams and Denise Bense, and defendant Danek Medical, Inc. was represented by Paul Felt, Richard Chamovitz, and Joni Jones. Having fully considered the arguments of counsel, the materials submitted to the court, and all applicable legal authority, the court now enters the following order.

### Background

McCollin has brought this lawsuit against Synthes and Danek, the manufacturers of two spinal implants used during his spinal surgeries conducted on April 24, 1991 and on November 27, 1991. McCollin injured his back for the first time in 1977; he again injured his back while working as a carpenter in July 1990. McCollin's back problems failed to respond to conservative treatment, including physical therapy and anti-inflammatory medication. By December 1990, McCollin's back pain was so severe that he stopped working. In March of 1991, McCollin's orthopedic surgeon, Dr. Reed Fogg, recommended surgery to fuse his spine. Dr. Fogg performed the surgery on April 24, 1991. During the surgery, Dr. Fogg implanted Synthes's AO/ DCP plates, using a technique called "pedicle fixation" to stabilize McCollin's spine and facilitate the growth of newly-implanted bone grafts.

However, McCollin's bone grafts did not grow and fusion was not achieved; McCollin's pain persisted. On November 27, 1991, Dr. Fogg removed the Synthes device, renewed the bone grafts, and implanted defendant Danek's Texas Scottish Rite Hospital (TSRH) system of plates and screws to stabilize McCollin's spine to promote fusion. After his second operation, McCollin's pain continued. During follow-up visits between March 1992 and August 1993, Dr. Fogg noted that McCollin had achieved fusion where the Danek device had been implanted, that his bone had healed, and that the Danek hardware was in good condition.

McCollin filed this lawsuit on December 15, 1995, following a December 16, 1993 broadcast of *20/20* which examined pedicle implantation surgery and suggested that the use of implants was improper because the FDA had not approved them for use in the spinal pedicles. Over 5000 other plaintiffs have filed similar suits. The 2300 resulting cases were consolidated by the Judicial Panel on Multidistrict Litigation, which designated the Eastern District Court of Pennsylvania under the Honorable Louis C. Bechtle as the transferee court. Judge Bechtle provides a comprehensive discussion of the common theories proffered by the plaintiffs in *In re Orthopedic Bone Screw Products Liability Litigation*, No. MDL 1014, 1997 WL 186325 (E.D.Pa. April 16, 1997). The Judicial Panel on Multidistrict Litigation remanded McCollin's case after Judge Bechtle had coordinated plaintiffs' complaints, supervised case-wide discovery matters, evaluated generic expert witnesses, and considered summary judgment motions on case-wide issues. After remand, this court con-

---

1. Apparently Karen McCollin has voluntarily dismissed her loss of consortium claim. Therefore the court will refer to McCollin as the only plaintiff in this lawsuit. This order is not dispositive of Karen McCollin's claims, if any remain.

solidated McCollin's separate suits against Synthes and Danek.

### Discussion

#### I. Standard of Review

A party is entitled to summary judgment on all claims as to which there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Before the court can rule on a defendant's motion for summary judgment, the defendant must satisfy its burden of production. A defendant can meet this burden in one of two ways: by putting evidence into the record which affirmatively disproves an element of the plaintiff's case, or by directing the court's attention to the fact that the plaintiff lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met the burden of production, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion must set forth specific facts showing a genuine issue for trial; mere allegations and references to the pleadings will not suffice. *See Anderson*, 477 U.S. at 248, 256, 106 S.Ct. 2505. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

#### II. Synthes's Motion for Summary Judgment

McCollin claims that the Synthes device caused his bone graft failure, the need for a second surgery, and pain. McCollin asserts various claims against Synthes: strict liability, negligence per se, negligence, and breach of the warranty of merchantability. Synthes contends that all of McCollin's claims are barred by the statute of limitations.[2]

The Utah statute of limitations applies to all claims brought by McCollin. *See Strickland v. General Motors Corp.*, 852 F.Supp. 956, 958–59 (stating that the language of Utah Code Ann. § 78–15–3 suggests that "the Utah legislature ... intended that all claims against a manufacturer, based on a defective product, be subject to § 78–15–3 regardless of the theory alleged"). The statute of limitations states: "[a] civil action under this chapter [of the Product Liability Act] shall be brought within two years from the time the individual who would be the claimant in such action discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." *See* Utah Code Ann. § 78–15–3 (1996). Section 78–15–3 explicitly incorporates the discovery rule by providing that the limitations period begins to run when the claimant "discovered, or in the exercise of due diligence should have discovered, both the harm and its cause." *Id.*

Synthes argues that the alleged injury caused by Synthes's orthopedic implants

---

**2.** Judge Bechtle imposed discovery sanctions on Synthes during the multidistrict phase of this litigation in Pretrial Order number 1198, ordering that Synthes was barred from raising statute of limitations defenses in actions included in the multidistrict litigation. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, No. MDL 1014, 1997 WL 805219 at *6 (E.D.Pa. Dec.11, 1997). However, Judge Bechtle later modified his order, stating that "Synthes may assert the statute of limitations defense against any claim for which the statute of limitations expired prior to April 1, 1995...." *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, No. MDL 1014, 1998 WL 254038 at *6 (E.D.Pa. May 5, 1998). Therefore Synthes is not precluded from raising this defense in the McCollins' case.

---

occurred on the date of the first surgery, April 24, 1991. Synthes contends that at the latest, McCollin should have known of the alleged injury on November 24, 1991, the date Dr. Fogg removed the Synthes implants and replaced them with the Danek device. According to McCollin, he did not know of the harm and its cause until he viewed the *20/20* program on December 16, 1993, which alerted him to the fact that the Synthes device was not FDA-approved for use as a spinal implant. (*See* Pl.'s Mem.Opp. Summ.J. at 12).

■ Generally, the question of when a plaintiff knew, or with reasonable diligence should have known, of a cause of action is a question of fact for the jury. *See Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). However, where the evidence is such that no genuine issue of material fact exists, the determination can be made as a matter of law. *See id.* at 1388; *see also McKinnon v. Tambrands, Inc.*, 815 F.Supp. 415, 418 (D.Utah 1993).

■ In order to determine when the statute of limitations began to run, the court must decide when McCollin discovered, or with due diligence should have discovered, his harm and its cause. *See* Utah Code Ann. § 78–15–3. McCollin stated he experienced a "sharp increase" in his pain when he tried to return to work after the first surgery. (*See* Pl.'s Mem.Opp. Summ. J., Ex. 27 at 28). He stated that he had "no doubt" that the first surgery made his back pain worse. (*See id.* at 65). McCollin acknowledges that Dr. Fogg told him the first surgery was a failure, and that the bone had failed to fuse. (*See id.* at 68). He stated that Dr. Fogg recommended a second surgery in September or October of 1991. (*See id.*).

McCollin testified that Dr. Fogg told him that the need for the second surgery was caused by the fact that "the hardware was not holding the bone where it needed to be ... for the graft to grow." (*See id.*). When asked in his deposition to define what "[his] problem was before the second surgery," he answered "the failure of the hardware to hold long enough for the bone graft to do what it's got to do." (*See id.* at 71, 102). Dr. Fogg told McCollin that the hardware to be used in the second surgery was stronger and better than the first implant, and that several other patients were in the same situation, that is, needing second surgeries to replace implants where bone grafts had failed to grow. (*See id.* at 69–71).

It is clear from this evidence that McCollin "discovered, or in the exercise of due diligence should have discovered, both the harm and its cause" by the time he underwent the second surgery on November 24, 1991. Utah Code Ann. § 78–15–3; *see also Caplin v. Danek Medical, Inc.*, No. 94–2542–A, 1999 U.S. Dist. LEXIS 1187 (M.D.La., January 8, 1999) (finding statute of limitations began to run when second surgery gave plaintiff notice that first implant had harmed him).

At oral argument, plaintiff's counsel argued that the discovery rule should toll the statute of limitations beyond the date of the second surgery, because McCollin did not learn of the "cause" of his injury until he viewed the *20/20* program on December 16, 1993. (*See id.* at 104). That program alerted McCollin to the fact that Dr. Fogg had used the Synthes implant for an off-label purpose when he implanted it in McCollin's spine, and suggested that orthopedic bone screw manufacturers had improperly marketed their implants for spinal use.

However, the record reveals no information that McCollin received from the *20/20* program relevant to his product liability claims. The *20/20* program did not consider any products manufactured by Synthes. Off-label use of FDA-approved prescription medical devices is legal. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, No. MDL 1014, 1996 WL 107556 *5 (E.D.Pa. March 8, 1996) (stating "a physician is free to use a medical device for an off-label purpose, if, in the physician's best medical judgment he or she believes that the use of the device will benefit the patient"). Even if the alleged mislabeling

were somehow related to his injury, McCollin knew enough in 1991 to have filed suit against Synthes and begun discovery into the questions of negligence, product defect, failure to warn, and warranty of merchantability long before the statute of limitations had run.

■■■ Statutes of limitation are intended to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Aragon v. Clover Club Foods Co.*, 857 P.2d 250, 252 (Utah Ct.App.1993) (quoting *Order of R.R. Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944)). The discovery rule does not allow plaintiffs to delay filing suit until they have ascertained every last detail of their claims. *See McKinnon v. Tambrands, Inc.*, 815 F.Supp. 415, 421 (D.Utah 1993) (finding that the statute of limitations began to run when plaintiff had been alerted to a possible cause of action). "The discovery rule does not apply to a plaintiff who becomes aware of his injuries or damages and a possible cause of action before the statute of limitations expires." *See id.* at 421 (quoting *Atwood v. Sturm, Ruger, & Co.*, 823 P.2d 1064, 1065 (Utah 1992)). "All that is required [to trigger the statute of limitations] is ... sufficient information to apprise [the plaintiffs of the underlying cause of action] so as to put them on notice to make further inquiry if they harbor doubts or questions" about the defendant's actions. *United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 889 (Utah 1993); *see also Baldwin v. Burton*, 850 P.2d 1188, 1196 (Utah 1993) (quoting *Auerbach v. Samuels*, 10 Utah 2d 152, 349 P.2d 1112, 1116 (1960). "[T]he three-year statute of limitations for fraud 'begins to run from the time the person entitled to the property knows, or

by reasonable diligence and inquiry should know, the relevant facts' of the fraud"). In a case brought under the Federal Tort Claims Act, the United States Supreme Court commented:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable ... and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask.

*United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

This lawsuit was not filed until December 15, 1995, more than two years after the statute of limitations had expired. Synthes's motion for summary judgment on all claims is GRANTED.

### III. *Danek's Motion for Summary Judgment*

While it is not entirely clear from the materials now before the court, it appears that McCollin contends that the Danek device injured him by causing his back pain to persist after the second surgery, necessitating prescriptions for pain medication, preventing him from returning work, and qualifying him for Social Security as a completely disabled person. In his complaint, McCollin brought claims against Danek under theories of fraud on the FDA, conspiracy, and product liability, and Karen McCollin brought a claim for loss of consortium.[3]

---

3. Karen McCollin has apparently voluntarily dismissed her loss of consortium claim as noted in footnote 1, and in the multidistrict phase of this case, Judge Bechtle dismissed the fraud on the FDA claims. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, PTO 845,

1997 WL 305257 (E.D.Pa. March 28, 1997) (reaffirming dismissal in light of *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)); *see also In re Orthopedic Bone Screw Prod. Liab. Litig.*, 159 F.3d

Danek has moved for summary judgment on all of McCollin's remaining claims, arguing, among other theories, that McCollin has failed to provide evidence that would be admissible at trial indicating that Danek's TSRH implant system caused him injury. Danek has pointed to the fact that one of McCollin's own expert witnesses on causation, Dr. Andrew T. Kucharchuk, does not support a finding that the Danek device caused any injury. Dr. Kucharchuk stated "[a]pparently the Scottish Rite instrumentation [the Danek TSRH system] on the right side did work...." (*See* Pl.'s Mem.Opp. Summ.J., Ex. 30 at 3–4). Danek also points to the testimony of McCollin's surgeon Dr. Reed Fogg, who stated that three months after the Danek device was implanted the surgery appeared successful, and that follow up examinations over the next two years showed that the hardware remained in place and that bone fusion occurred. (*See* Pl.'s Mem.Opp. Summ.J., Ex. 31 at 72–73, 76–77). Furthermore, Dr. Fogg stated that there was no evidence that the screws ever broke, or became dislodged, and that he believed that McCollin's pain "didn't have anything to do with the pedicle screw." (*See id.* at 78–81).

Once Danek has shown that McCollin lacks evidentiary support for causation, an essential element of his claims, the burden shifts to McCollin to demonstrate the existence of evidence creating an issue of material fact on causation. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To meet his burden, McCollin offers the expert testimony of Lance Yarus, D.O., who provides an opinion that the Danek TSRH system caused injury to McCollin.

■ Rule 56(e) of the Federal Rules of Civil Procedure states that "opposing affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." The form of the plaintiff's evidence at summary judgment need not be admissible at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating that the non-moving party does not have to produce evidence in "a form that would be admissible at trial ... [o]bviously Rule 56 does not require the non-moving party to depose her own witnesses"). However, the substance of the non-moving party's evidence must eventually be admissible to show that there is a genuine issue for trial. *See id.* "[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *See id.* at 252, 106 S.Ct. 2505.

To be admissible, an expert's testimony must meet the standards of Rule 702. The Supreme Court has defined the applicable standards in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Kumho Tire Co. Ltd. v. Carmichael,* —— U.S. ——, ——, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (reviewing a decision granting summary judgment and stating that courts must exercise "gatekeeping" function to ensure that all expert testimony is reliable and relevant, using the general principles presented in *Daubert* ); *United States v. Charley,* 176 F.3d 1265, 1277 (10th Cir. 1999) (applying the principles of *Kumho Tire Co.*). To be admissible, Dr. Lance Yarus' opinion about McCollin's persistent pain must meet the requirements of *Kumho* and *Daubert.*

817 (3d Cir.1998) (holding that the Medical Device Amendments did not preempt viable state law claims, and that state claims based on fraud on the FDA could be reinstated by district courts on remand). Judge Bechtle also dismissed the conspiracy and concert of action claims in *In re Orthopedic Bone Screw Prod. Liab. Litig.,* PTO 861, 1997 WL 186325 (E.D.Pa. April 16, 1997).

The first requirement for the admissibility of expert testimony under Rule 702 is that the witness must actually be qualified. This requirement is construed liberally. *See In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 741 (10th Cir. 1994). Dr. Yarus is an osteopath. He observed lumbar fusion surgery using implanted instrumentation during his residency in 1982–86 but has not participated in any surgery to implant or remove spinal implants in the last thirteen years. (*See* Pl.'s Mem.Opp. Summ.J., Ex. 52 at 56–60, 125, 127). He has not participated in lumbar fusion surgery of any kind within the last nine years. (*See id.* at 125). He has not published any articles in medical journals since his residency ended. (*See id.* at 152). Dr. Yarus does work as a sole practitioner in a general orthopedic practice, has admission privileges at local hospitals, and conducts orthopedic surgery on a regular basis. (*See id.* at 107–09). The court concludes that, although the issue is not without question, Dr. Yarus is marginally qualified to express an opinion in this case. However, the question of the reliability of Dr. Yarus's testimony does not end with this conclusion.

The second requirement for the analysis under Rule 702 is to determine whether the process or technique used by Dr. Yarus in formulating his opinion is reliable. *See In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 742 (10th Cir. 1994). To be admissible, the expert must follow "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co. Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). Under the standards outlined in *Daubert,* the trial court may examine the methodology employed by an expert to reach the offered opinion, whether that theory has been tested, whether it has been subjected to peer review or publication, whether it has a known potential rate of error, and whether it is generally accepted within the relevant scientific community. *See id.* at 1176. However, this list of factors is not definitive, and trial courts have considerable leeway in each particular case to choose how to go about determining whether particular expert testimony is reliable. *See id.* at 1277. With this guidance in mind, the court now turns to Dr. Yarus and the process he employed to formulate his opinion.

Dr. Yarus's report summarizes McCollin's medical records and concludes:

"It is my opinion to a reasonable degree of medical certainty that the problems and difficulties which were experienced by Mr. McCullin [sic] would be directly and proximately caused by the implantation of metallic devices for treatment of his lumbar spine condition. It is with a high degree of medical certainty that the disability impairment that continued would be directly related and casually [sic] effected [sic] by the implantation of metallic screw and fixation devices.... It is my opinion to a reasonable degree of medical certainty that all the recommendations made [for medication and procedures to relieve pain] were the proximate and direct cause of the implantation of metallic devices [sic]...."

(*See* Pl.'s Mem.Opp. Summ.J., Ex. 28 at 4). However, Dr. Yarus does not point out any symptoms occurring after the surgery that did not also exist before the surgery, or any basis for concluding that the implant caused McCollin's pain when compared to other possible causes. Yarus has never personally examined the TSRH implant manufactured by Danek. (*See* Pl.'s Mem. Opp. Summ.J., Ex. 52 at 59). He has never personally examined McCollin, spoken with any of McCollin's treating physicians, or reviewed X-rays of McCollin's surgical site. (*See* Pl.'s Mem.Opp. Summ. J., Ex. 29 at 27).

At the hearing conducted on Danek's motion, plaintiff's counsel explained the method employed by Dr. Yarus in forming his opinion: The plaintiffs' legal committee conducting discovery for the multidistrict litigation employed registered nurses to select "relevant" documents from the large volume of McCollin's medical records.

Plaintiff's counsel then conducted an interview with McCollin to determine how his symptoms had developed since the last examination reflected in his medical records. The plaintiff's counsel then forwarded the selected medical records and the interview summary to Dr. Yarus for his assessment. (*See* Pl.'s Mem.Opp. Summ. J., Ex. 29 at 22–23).

It is clear that Dr. Yarus's method for formulating his opinion falls far short of the requirements the Supreme Court established in *Daubert*. It is clear that no expert orthopedic surgeon would attempt to make a diagnosis without examining the patient, without considering the entirety of a patient's records, by allowing a non-doctor to select records before she considered them, or by allowing non-medical personnel to conduct patient interviews used for diagnostic purposes. When asked in his deposition whether he performed a differential diagnosis to rule out other potential causes for McCollin's pain, Yarus stated that he had, based on the records submitted to him, and stated, "Well, just looking at the general history of this gentleman there are certainly a myriad of causes that you can say mimic the type of symptoms that he had. We talked about metabolic diseases, thyroid disease, diabetes. Any types of injuries that might have occurred in the extremities, peripheral vascular disease." (*See* Pl.'s Mem.Opp. Summ.J., Ex. 29 at 102). However, Yarus does not provide any explanation for how he ruled out these other potential causes to arrive at his conclusion that the Danek implant caused the pain. Without proper grounding in valid scientific methodology, Dr. Yarus's conclusions are speculative, at best. Dr. Yarus's testimony is unreliable and would not be admissible at trial under the standards set forth by the Supreme Court in *Daubert* and *Kumho Tire. See* 509 U.S. at 589, 113 S.Ct. 2786 (1993); —— U.S. ——, ——, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). Dr. Yarus's conclusory speculations therefore fail to create an issue of material fact sufficient to withstand Danek's motion for summary judgment. *See, e.g., Jetcraft*

*Corp. v. Flight Safety* Int'l, 16 F.3d 362, 366 (10th Cir.1993) (excluding an expert opinion based on mere speculation); *Stevensen v. Goodson*, 924 P.2d 339, 347 (Utah 1996) (upholding trial court decision to strike expert testimony as speculation).

The court notes that other courts, when faced with the decision of whether to admit Dr. Yarus's testimony, have held that his testimony is not admissible. *See Hartwell v. Danek Medical, Inc.*, 47 F.Supp.2d 703, 712–13 (W.D.Va.1999) (finding Yarus's opinion inadmissible under the standards of *Daubert* and *Kumho*, stating "Dr. Yarus' ... armchair-quarterback style evades meaningful testing, eludes peer review, and makes error rates incalculable.... Opinions based on his ill regard for the use of pedicle screw fixation are at best conclusory, and, at worst, just bad science and junk medicine"); *McLellan v. Sofamor–Danek Group, Inc.*, No. 95–CV–0322E(H), 1999 WL 222591 (W.D.N.Y. April 12, 1999) (striking Dr. Yarus' testimony as inadmissible under Rule 702); *Leigh v. Danek Medical, Inc.*, No. 4:95–CV–797–A at 14 (N.D.Tex. Sept. 14, 1998) (stating "Yarus cannot point out any symptoms that plaintiff had after surgery that he did not have before surgery ... he simply opines that since the plaintiff had pain before surgery and that pain worsened after surgery, the worsened pain must be a result of the instrumentation. The only conclusion to be drawn in this case is that Yarus's testimony was influenced by a litigation-driven financial incentive"); *Moses v. Danek Medical, Inc.*, CV–S–95–512–DWH, 1998 U.S. Dist. LEXIS 21110 at *17 (Nev. Nov. 18, 1998) (stating that Yarus's method of "simple logic as opposed to medical training, experience, and examination" has not gained acceptance in the relevant scientific community, that "there is no indication that Dr. Yarus' peers competently discover such causal relationships ... from a desk [as opposed to using patient examination]," and that Yarus's opinion "cites conclusions only ... Dr. Yarus's opinion ... should not be admissible in the case at bar"); *Baker v.*

*Danek Medical, Inc.,* 35 F.Supp.2d 875, 878–80 (N.D.Fla.1998) (holding that Yarus's testimony of a temporal connection between the implantation and plaintiff's symptoms was insufficient to show causation); *West v. Danek Medical, Inc.,* No. CIV–97–575–T at 4 (W.D.Fla. Dec. 28, 1998) (finding Yarus's testimony insufficient to establish causation and granting summary judgment).

Opinions like Yarus's, which infer causation from the temporal relationship between pain and implantation surgery, have been dismissed by many courts. *See Huntman v. Danek Medical, Inc.,* No. 97–2155–IEG at 7 (S.D.Ca. July 24, 1997) (stating that the fact plaintiff experienced pain after surgery is insufficient, by itself, to create an issue of fact regarding causation); *Cali v. Danek Medical, Inc.,* 24 F.Supp.2d 941, 954 (W.D.Wis. 1998) (holding that expert testimony was "unsupported speculation ... not entitled to the dignity of evidence," and that "where symptoms may be the subject of a variety of causes it is insufficient for an expert to opine as to the cause of the symptom without some scientific basis other than his assertion of general experience"); *West v. Danek Medical, Inc.,* No. 97–575–T at 6 (W.D.Okla. Dec.28, 1998) (stating "the court does not understand how the surgery's asserted failure to alleviate the plaintiff's problems ... establishes the required connection between the fixation device and the plaintiff's present condition"); *Burton v. Danek Medical, Inc.,* No. CIV.A.95–5565, 1999 WL 118020 at *4–5 (E.D.Pa. March 1, 1999) (excluding a plaintiff's expert who failed to perform a differential diagnosis, stating that "there is no connection between Mr. Burton's medical records and Dr. Bennett's conclusion"); *Hickman v. Sofamor–Danek Group, Inc.,* No. C–95–1095 CW at 20–21 (N.D.Ca. Feb. 18, 1999) (stating "[n]either [witness] ... supported his conclusions with peer-reviewed research, identified an objective source of information on which his conclusions were based, or demonstrated that he followed a generally accepted or scientifically reliable diagnostic methodology used by other professionals ... neither doctor's testimony meets the standard for reliability established in *Daubert*").

Because the opinion of Dr. Yarus is not admissible, the plaintiff has failed to demonstrate an issue of material fact regarding causation in this case. Therefore Danek's motion for summary judgment is GRANTED.

### IV. *Plaintiff's Motion to Reinstate the Fraud on the FDA Claim*

■ McCollin has filed a motion to reinstate the fraud on the FDA claim in his case against Danek. He argues that the Third Circuit holding in *In re Orthopedic Bone Screw Products Liability Litigation* reversed Judge Bechtle's pretrial order dismissing this claim. *See* 159 F.3d 817 (3rd Cir.1998); *In re Orthopedic Bone Screw Prod. Liab. Litig.,* PTO 845, 1997 WL 305257 (E.D.Pa. March 28, 1997). The Third Circuit held that under the Supreme Court's recent decision in *Medtronic v. Lohr,* the Medical Device Amendments do not preempt state common law liability for conduct violating the FDCA. *See In re Orthopedic Bone Screw Prod. Liab. Litig.,* 159 F.3d 817 at 824. However, for McCollin to succeed in proving a fraud on the FDA claim, he must show that the Danek's submissions to the FDA caused Dr. Fogg to choose the TSRH system, and to show it caused him injury according to Utah tort law. *See In re Orthopedic Bone Screw Prod. Liab. Litig.,* 159 F.3d at 826–27. McCollin has failed to offer admissible evidence showing that the TSRH implant caused any injury, since the testimony of his expert, Dr. Yarus, is not admissible. Because McCollin has failed to withstand summary judgment on his state law tort claims, his fraud on the FDA claim would also fail for lack of causation. The court determines that McCollin's motion to reinstate his fraud on the FDA claim is MOOT in light of the court's summary judgment decisions.

The defendants' motion in limine to exclude plaintiff's expert witnesses on fraud FDA is also MOOT.

*Order*

For the foregoing reasons, Synthes's motion for summary judgment is GRANTED. Danek's motion for summary judgment is GRANTED, and plaintiff's motion to reinstate his fraud on the FDA claim is MOOT.

SO ORDERED.