WASHINGTON LEGAL FOUNDATION, Plaintiff,

v.

David A. KESSLER, in his official capacity as Commissioner, Food and Drug Administration

and

Donna Shalala, in her official capacity as Secretary, U.S. Dept. of Health and Human Services, Defendants.

Civ. A. No. 94–1306 (RCL).

United States District Court, District of Columbia.

March 9, 1995.

Richard A. Samp, Washington Legal Foundation, Washington, DC, for plaintiff.

Daniel Franklin Van Horn, Gerald Cooper Kell, U.S. Dept. of Justice, Office of Consumer Litigation, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Plaintiff Washington Legal Foundation ("WLF"), a public interest law and policy center based in Washington, D.C., has filed suit in this court, alleging that the Food and Drug Administration ("FDA") has adopted a policy which violates the First Amendment right of certain members of WLF to receive

information concerning "off-label" uses of various drugs and medical devices. Specifically, plaintiff claims that the FDA has adopted an agency policy which prohibits manufacturers of drugs and medical devices from distributing or assisting in the distribution of information relating to off-label usage of these products except under certain narrowly defined circumstances. Plaintiff seeks an order from this court declaring the FDA policy unconstitutional and enjoining the agency from enforcing it. The FDA contends that it has not adopted a final agency position regarding manufacturer-supported distribution of information concerning off-label usage, and that plaintiff's claim is therefore premature. Now pending before the court is the defendants' motion to dismiss for lack of subject matter jurisdiction, Fed. R.Civ.P. 12(b)(1), or for failure to state a claim upon which relief can be granted, Fed. R.Civ.P. 12(b)(6). For the reasons set forth below, the defendants' motion will be denied.

## I. Factual Background

The FDA derives its authority to regulate various aspects of the medical and pharmaceutical industries from a complex statutory and regulatory scheme, a major portion of which is embodied in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., and the regulations promulgated thereunder. One of the FDA's responsibilities under this scheme is to ensure that any new drug or class III medical device sought to be introduced into interstate commerce is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) et seq. Another duty of the FDA is to ensure that such products are accompanied by labeling information which sets forth the uses for which the product has been found to be safe and effective. It is unlawful to introduce into interstate commerce any human drug or medical device which has not been demonstrated to be safe and effective for each of the intended uses set forth in this labeling. See 21 U.S.C. §§ 331(a) and (d). "Labeling" is defined to include all "written, printed, or graphic" materials "accompanying" a product, 21 U.S.C. § 321(m), and it is clear that supplementary or explanatory information disseminated by the producer of a drug or device may constitute "labeling," regardless of whether it physically accompanies the product. E.g., Kordel v. United States, 335 U.S. 345, 349–50, 69 S.Ct. 106, 109–10, 93 L.Ed. 52 (1948).

At issue in this case are activities of drug and medical device manufacturers which the FDA contends amount to improper labeling of medical products. Two practices in particular have attracted the attention of the FDA. The first involves the distribution by manufacturers to doctors of so-called "enduring materials" (such as medical journals, articles, and textbooks) which contain information regarding "off-label"[1] uses of the manufacturer's products. The distribution of enduring materials to health care professionals appears to be a common tool for manufacturers seeking to maintain good customer relations with those who purchase their products. The other practice with which the FDA has become concerned is manufacturer support of scientific or educational activities (such as medical symposia) at which off-label uses of the manufacturer's products are discussed or demonstrated. Again, sponsorship of medical symposia and the like is a common public relations practice for manufacturers of medical products.

According to WLF, the FDA has determined that each of these activities constitutes improper labeling and/or promotion when it involves the distribution of materials or sponsorship of activities in which off-label usage of one of the manufacturer's products is discussed. WLF further contends that this determination has taken the form of a specific agency policy which the FDA has been enforcing for several years against medical product manufacturers, and which it intends to continue to enforce in the future. In support of its argument that the FDA has adopted a final agency policy, WLF includes

1. "Off-label" usage refers to the use of a drug or device in a manner not approved by the FDA and not set forth in the product's labeling materials. While manufacturers may not themselves promote such uses, it is not unlawful for doctors to employ or prescribe medical products for "unapproved" uses. Indeed, the FDA claims that it has "long recognized the important role that some unapproved uses may play in the practice of medicine." Def.'s Mem.Supp.M.Dis. at 9.

as exhibits to its complaint letters from representatives of the FDA to manufacturers regarding the manufacturers' plans to distribute certain enduring materials to physicians. One such letter concerns a company's plans to reprint and distribute to medical specialists selected chapters from a standard oncology textbook. According to WLF, these chapters discussed, *inter alia*, off-label uses of many different manufacturers' products besides those of the company seeking to distribute the reprints. In the letter, the FDA representative told the company that the planned distribution was "unacceptable," but that "[t]he entire unaltered textbook could possibly be distributed as a 'service' of [the company,] assuming that discussions of uses of [the company's] drugs do not constitute a major portion of the book." Compl. Att. 1, Ex. B.

As further support for its contention that the FDA has adopted final policy concerning distribution of off-label usage information, WLF cites a letter written by Ronald Johnson, Director of the FDA's Office of Compliance, Center for Devices and Radiological Health, to a company which had helped sponsor a program entitled "Pedicle Fixation of the Lumbar Spine and Other Advanced Techniques." In this letter, Mr. Johnson stated that "[t]he Food and Drug Administration has reviewed promotional materials showing that" the company "promoted" off-label uses for its products at the program. Compl.Att. 1, Ex. E. Mr. Johnson appears to have made this determination based on the contents of a promotional brochure which purportedly showed that an individual "associated with" the company had provided information and devices used during the "hands on" training portion of the program. In the letter to the manufacturer, Mr. Johnson states that "[s]upporting such programs and providing devices for the purpose of hands-on training in the use of the devices for this unapproved use constitutes promotion of the devices for such use." *Id.* The letter goes on to state that the "FDA requests that [the company] cease sponsoring promotional programs which detail the use of your devices for this unapproved use, and that [the company] cease supplying devices to programs which include information and 'hands on

training' for the use of your devices in this procedure." *Id.* The letter closes with Mr. Johnson's request for "a written response detailing your plans to correct these *violations*, and your intentions to comply with this Warning Letter." *Id.* (emphasis supplied).

The FDA maintains that it has not adopted a final agency policy regarding manufacturer distribution of information concerning off-label usage. In support of this argument, FDA describes its standard procedure for formulating final agency policy and notes that this procedure has not yet been completed. FDA contends that so long as the agency has not released a formal policy statement or instituted an enforcement action against a manufacturer, there is no "final agency action" reviewable in this court. Def.'s Mem. Supp.M.Dis. at 28. The FDA is quite mistaken. Nevertheless, because the procedure by which the FDA formulates agency policy is relevant to this case, a brief description of that procedure is warranted.

The FDA claims that it is in the process of revising its policies on industry-supported promotion of off-label uses of medical products. As part of this process, the FDA published a "Draft Policy Statement on Industry–Supported Scientific and Educational Activities" ("Draft Policy Statement") in the Federal Register in November of 1992. 57 Fed.Reg. 56412 (Nov. 27, 1992). By its terms, this Draft Policy Statement represents a tentative agency position concerning how the FDA intends to distinguish between manufacturer-supported activities "that are otherwise independent from the promotional influence of the supporting company [and are therefore permissible] and those that are not [and. therefore violate the Federal Food, Drug and Cosmetic Act]." *Id.* The Draft Policy Statement sets forth a number of criteria that the FDA considers useful in distinguishing between independent and impermissibly manufacturer-influenced activities. Central to the scheme proposed in the Draft Policy Statement is FDA's recommendation that companies wishing to support activities involving discussion of off-label uses enter into written agreements with the "providers" of the activities. Such a written agreement should "reflect that the company and provid-

er agree that the activity is to be educational and nonpromotional and that the company has taken steps to ensure that it has no role in the design or conduct of the program that might bias the treatment of the topic." *Id.* at 56413. The FDA maintains that the policies and procedures described in the Draft Policy Statement have not yet been adopted as official FDA policy, and that the agency is still in the process of formulating its final policy statement.

In October of 1993, plaintiff WLF filed a Citizen Petition[2] with the FDA pursuant to 21 C.F.R. § 10.30. In its petition, WLF claims that the FDA has "a strong aversion to the dissemination of information regarding off-label uses of drugs and medical devices," Citizen Petition at 2; that the FDA has attempted to act beyond the ambit of its statutory powers in regulating such activities; and that the FDA, through its Draft Policy Statement, warning letters, and other means, has successfully intimidated manufacturers into not distributing off-label usage information. According to WLF, the FDA's actions, in the aggregate, amount to a formal agency policy which impermissibly trammels the First Amendment rights of manufacturers and doctors to disseminate and receive, respectively, this information. *Id.* at 12–15. The petition requests that the FDA formally withdraw its Draft Policy Statement and adopt a policy which           .

> recognizes the important role played by off-label uses of approved drugs and medical devices ... and that declares that FDA will not interfere in non-labeling activities of drug and medical device manufacturers whose effect is to promote—through the dissemination of truthful medical information—off-label uses of approved drugs and medical devices.

*Id.* at 3.

FDA regulations provide that the agency must respond to a Citizen Petition within 180 days. 21 C.F.R. § 10.30(e)(2). The FDA may respond in one of three ways: it may 1) grant the petition; 2) deny the petition; or 3) provide a "tentative" response informing the petitioner that the agency requires additional time to respond. *Id.* WLF maintains that FDA offered no response at all to WLF's petition until July 14, 1993—some 270 days after WLF filed its petition, and several weeks after WLF filed the present lawsuit. The FDA's response to WLF's petition was a statement of its intention to publish the petition in the Federal Register for public comment, with the indication that it would act on the petition after reviewing those comments.[3] At oral argument on the present motion, counsel for FDA indicated that the administrative review process is on-going and that the agency will require at least one more year to complete this process and release a final agency position on the off-label usage issue. Despite FDA's claims to the contrary, WLF maintains that FDA has in fact been enforcing a clearly defined policy concerning manufacturer support of off-label uses since 1992. WLF alleges that this policy is unconstitutional and seeks an order from this court pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, declaring that the policy violates the First Amendment rights of WLF's members and enjoining the FDA from continuing to enforce the policy.

## II. Motion to Dismiss

Defendants move to dismiss WLF's suit on a number of grounds. First, defendants argue that the doctors who are members of WLF and who claim to have been harmed by the alleged FDA policy do not have standing to maintain this lawsuit. According to FDA, the doctors have not experienced any direct harm as a result of FDA's action, therefore no "case or controversy" exists as between these doctors and the FDA. FDA also argues that, in addition to WLF's lack of standing, its claims are not ripe for judicial review. Finally, FDA asserts that this court does not have jurisdiction to order the relief sought by

---

**2.** Citizen Petition of Washington Legal Foundation to Food and Drug Administration (Oct. 22, 1993) (hereinafter "Citizen Petition"). Compl. Att. 1.

**3.** The FDA did subsequently publish a Notice of Filing in the Federal Register wherein the agency solicited public comments on WLF's Citizen Petition. Comments on the petition were due no later than February 16, 1995. *See* 59 Fed.Reg. 59820 (November 18, 1994).

WLF. Because each of these contentions is without merit, defendants' motion to dismiss will be denied.

In resolving a motion to dismiss, the plaintiff's factual allegations must be presumed true and liberally construed in favor of the plaintiff. *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C.Cir.1979) (citing *Miree v. Dekalb County, Georgia*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492–93 n. 2, 53 L.Ed.2d 557 (1977)). In addition, the plaintiff must be given every favorable inference that may be drawn from his allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Dismissal is only appropriate if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief. *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987).

### A. Standing

■■■ Defendants' contention that WLF lacks standing to maintain this suit is insubstantial, and it need not detain the court long. An organization may have "representational" standing to sue on behalf of its members provided there is an injury-in-fact to at least one of the organization's members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Supreme Court has set forth the following three-part test for determining whether an organization may assert representational standing:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. at 2441. It is clear that WLF meets each of these three requirements.

#### 1. Member Standing

As counsel for the defendants conceded at oral argument, there exists an enforceable First Amendment right to receive information. *See Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748, 756, 96 S.Ct. 1817, 1822, 48 L.Ed.2d 346 (1975) (holding that "where a [willing] speaker exists ... the protection afforded [by the First Amendment] is to the communication, to its source *and to its recipients* both") (emphasis added). FDA's assertion that WLF's member-doctors have no enforceable First Amendment rights as against FDA is the product of a remarkably crabbed reading of WLF's complaint. The thrust of defendants' argument is that because the Draft Policy Statement is directed at drug manufacturers and not doctors, the alleged harm suffered by WLF's doctor-members is not "traceable" to any action on the part of FDA. However, as even a cursory reading of WLF's complaint makes clear, WLF is alleging that the FDA's actions with respect to manufacturer-supported distribution of off-label usage information have resulted in a significant curtailment of this source of information to doctors. The law is clear that where a law or other official act has resulted in the silencing of an otherwise willing speaker, those who wished to receive information from that speaker may challenge the constitutionality of the law or act. *Id.* at 756–57, 96 S.Ct. at 1822. Thus, there is no question that the doctors on whose behalf WLF seeks to maintain this lawsuit would have had standing to sue "in their own right" had they chosen to do so. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441.[4]

---

4. FDA argues that this court's ruling in *Action for Children's Television v. FCC*, 827 F.Supp. 4 (D.D.C.1993) (Lamberth, J.) stands for the proposition that organizations representing listeners lack standing to challenge regulatory actions of the FCC, and that this holding is fatal to WLF's claim that it has standing to sue the FDA on behalf of its members. FDA is mistaken. This court specifically noted in *AFCT* that the D.C. Circuit decision in *Illinois Citizens' Committee for Broadcasting v. FCC*, 515 F.2d 397 (D.C.Cir.

1975) was dispositive. *AFCT*, 827 F.Supp. at 12. In *Illinois Citizens'*, the court held that a listener group did not have standing to challenge the *procedure* by which the FCC issued "notices of apparent liability" to broadcasters; however, the court found that the listener group did have standing to challenge the *merits* of a decision to impose a fine against a broadcaster. *Illinois Citizens'*, 515 F.2d at 402–03. In the instant suit, WLF challenges the *substance* of the FDA's restrictions on manufacturer-supported dissemina-

## 2. Germaneness

Although the defendants do not allege that WLF's complaint fails the second prong of the *Hunt* test, the court notes that standing questions are jurisdictional and can therefore be raised at any time and are never waived. It seems prudent, then, to note that plaintiff's complaint alleges that Washington Legal Foundation "devotes a substantial portion of its resources to defending the rights of individuals and businesses to go about their affairs without undue interference from government regulators." Compl. ¶ 5. As such, the court finds that the interests sought to be protected in the present suit are "germane to" WLF's organizational purpose. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441.

## 3. Participation of Individual Members

The third prong of the *Hunt* test requires that neither the claim asserted nor the relief requested require the participation of individual members of the organization. *Id.* Nothing in the filings or arguments of the parties suggests that this lawsuit would require WLF's member-doctors to participate individually, and the court finds no reason to conclude otherwise. Accordingly, the court finds that WLF's suit meets each of the three representational standing requirements established by the Supreme Court in *Hunt* and accordingly rejects defendants' motion to dismiss for lack of standing.

## B. Finality, Ripeness, and Exhaustion

At the heart of the motion to dismiss is defendants' contention that WLF's dispute is not yet ripe for judicial review. Specifically, FDA asserts that 1) because FDA is still considering how to respond to WLF's Citizen Petition, WLF's suit is "premature"; 2) this dispute is not ripe for review, inasmuch as FDA has not adopted an official policy concerning manufacturer-supported distribution of off-label usage information; and 3) resolution of the dispute in its present posture would improvidently require the court to step into the FDA's role as a formulator of public health policy. The court is mindful of the serious concerns raised by these arguments. However, after a careful consideration of the filings and arguments of counsel, and the applicable case law, the court is convinced that this dispute is ripe for judicial review at this time.

## 1. Exhaustion

Defendants' argument that WLF's suit is "premature" seems to be an attempt to invoke the requirement that a party challenging the action of an administrative agency exhaust its remedies through the administrative process before turning to the courts. Although FDA does not explicitly style this issue as an "exhaustion" question, the tenor of FDA's filings and the cases it cites make clear that this is the thrust its argument. FDA notes that WLF's Citizen Petition is still pending before the agency and argues that WLF should therefore be required to wait until FDA has definitively ruled on the petition.[5] This argument is unpersuasive.

■ First, as described above, with regard to WLF's Citizen Petition, the FDA failed to follow the procedures set forth in its own regulations whereby the agency must respond to such petitions within 180 days of receiving them. FDA did not respond to WLF's petition for 270 days, and then only several weeks after the filing of the present lawsuit. At oral argument, counsel for the defendants explained that WLF's petition had "slipped through the cracks," and that the agency's failure to respond to the petition within the 180 day time period was wholly inadvertent. The court accepts this explanation, and also agrees with FDA that the agency's failure to respond timely to WLF's petition should not itself constitute a formal denial of the petition, for purposes of determining whether there has been final agency action. At the same time, however, the FDA's handling of WLF's Citizen Petition, as

---

tion of information concerning off-label usage and not the *procedure* employed by the FDA in determining whether a manufacturer has violated those restrictions; hence, nothing in either *AFCT* or *Illinois Citizens'* precludes a determination that WLF's member-doctors have standing to maintain this suit.

5. FDA does not contend and the court is not aware that any other administrative process exists besides filing a Citizen Petition through which WLF can seek relief from FDA's alleged off-label usage policy.

well as the statements in its filings and at oral argument, evidence a somewhat less vigilant concern for the doctors' First Amendment rights than this court would hope to see.

■ Furthermore, there does not seem to be any explicit statutory or regulatory requirement that WLF pursue any administrative remedy at all. The D.C. Circuit has noted that the exhaustion doctrine serves four primary purposes: 1) it ensures that persons do not flout legally established administrative processes; 2) it protects the autonomy of agency decisionmaking; 3) it aids judicial review by permitting factual development of issues relevant to the dispute; and 4) it serves judicial economy by avoiding repetitious administrative and judicial factfinding and by resolving some claims without judicial intervention. *Public Citizen Health Research Group v. Commissioner, Food & Drug Administration,* 740 F.2d 21, 29 (D.C.Cir.1984). The *Public Citizen* court went on to observe that "the exhaustion doctrine is not jurisdictional in nature ... and should not be applied blindly when the interests that the doctrine protects would not be served...." *Id.* (citations omitted). Application of the factors set forth in *Public Citizen* makes clear that WLF's suit should not be dismissed on exhaustion grounds.

First, it is clear that WLF has already attempted to resolve this dispute through the administrative process. While the court accepts that FDA's failure to respond within the 180 day time frame established under FDA's regulations was inadvertent, the court finds that in light of the two and one-half year time period that FDA estimates will be required to resolve WLF's dispute,[6] WLF's decision to seek judicial review cannot be described as an attempt to "flout" any "established administrative process." Second, the "autonomy of agency decisionmaking" is not implicated here, given the court's determination, set forth more fully below, that plaintiff's complaint does allege that the FDA has in fact adopted a firm agency policy concerning off-label usage information. Next, while it is possible that some additional

facts would be developed in the course of the FDA's resolution of WLF's citizen petition, any additional benefit this would provide is more than outweighed by the gravity of WLF's allegations concerning the impairment of its members' constitutional rights. *Cf. Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1976) (noting that "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions"). Finally, given plaintiff's allegations that FDA has not only promulgated, but has also sought to enforce (albeit somewhat informally) a final agency policy, the court doubts very much that WLF is likely to "successfully vindicate [its] claims" in an administrative proceeding before the FDA. In light of these conclusions, the court finds that WLF is not barred by the exhaustion doctrine from maintaining the present suit.

## 2. Ripeness

The strongest argument raised by FDA is its assertion that WLF's claims are not ripe for judicial review. FDA maintains that it has not yet adopted an official policy concerning manufacturer-supported off-label usage information, and therefore an attempt by this court to resolve the dispute at this stage would be premature and would usurp the FDA's role as a formulator of administrative policy. The court is mindful of the serious prudential concerns raised by FDA's ripeness argument. However, after balancing these concerns against the harm inflicted by the constitutional violations alleged in the plaintiff's complaint, the court concludes that it may exercise its powers of review and entertain this dispute now.

■ The ripeness doctrine has been explained by the D.C. Circuit this way:

The ripeness doctrine, which requires a court to evaluate the fitness of issues for judicial review and the hardship to the parties from withholding review, "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over

---

**6.** FDA received WLF's Citizen Petition approximately 18 months ago and estimates that it will require at least one more year to act on the petition.

administrative policies and ... protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Public Citizen,* 740 F.2d at 30 (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). In determining whether a dispute is ripe for review, a court should balance in a flexible and pragmatic manner the hardship to the parties from withholding review and the desire not to interfere with agency policymaking. *Ciba–Geigy Corp. v. U.S. Environmental Protection Agency,* 801 F.2d 430, 434 (D.C.Cir.1986). Furthermore, "[c]ourts confronted with close questions of ripeness are appropriately guided by the presumption of reviewability, especially when the affected person is confronted with the dilemma of choosing between disadvantageous compliance or risking imposition of serious penalties." *Id.* When deciding whether a dispute is fit for judicial review, a court must examine several factors including 1) whether the issue presented is purely legal; 2) whether consideration of that issue would benefit from a more concrete setting; and 3) whether the agency's action is "sufficiently final." *Id.* at 435. These factors must, in turn, be balanced against the harm suffered by the party affected by the agency action. *See Public Citizen,* 740 F.2d at 30.

■ The question of the "finality" of FDA's off-label usage policy is the linchpin of this case. As noted above, the parties are in complete disagreement on this fundamental issue. The FDA maintains that it has not yet formulated a final agency policy, while WLF contends that the FDA has not only promulgated such a final policy, but that it has been enforcing the policy for several years. At the outset, the court notes that "[t]he label an agency attaches to its action is not determinative." *Continental Airlines, Inc. v. CAB,* 522 F.2d 107, 124 (D.C.Cir.1974) (en banc). "In particular, we look primarily to whether the agency's position is definitive and whether it has a direct and immediate effect on the day-to-day business of the parties challenging the action." *Ciba–Geigy,* 801 F.2d at 435–36. As set forth below,

plaintiff's complaint does allege the existence of such a policy.

First, it is clear that the FDA has not *officially* promulgated a final agency policy concerning dissemination of off-label usage information. The FDA published a Draft Policy Statement concerning "industry-supported scientific and educational activities" in the Federal Register on November 19, 1992. 57 Fed.Reg. 56412. In addition to the Draft Policy Statement, FDA has also published in the Federal Register a "notice and request for comment" pertaining to WLF's Citizen Petition. 59 Fed.Reg. 59820 (Nov. 18, 1994). This request for comment contains a summary of FDA's regulatory role vis-a-vis drug and medical device manufacturers, an explanation of the Draft Policy Statement regarding industry-supported promotion of off-label uses, and a description of WLF's Citizen Petition. FDA contends that the Draft Policy Statement and the request for comment demonstrate that the FDA is still in the process of formulating a final agency policy.

■ Whether FDA has officially adopted a final policy, however, is not determinative. In the context of a ripeness inquiry, it is the *effect* of the agency's conduct which is most important in determining whether an agency has adopted a final policy. And this case illustrates why this must be so: If an agency's own characterization of the finality of its policy were determinative, that agency could effectively regulate industry without ever exposing itself to judicial review. A powerful agency such as FDA could achieve this result through the simple expedient of 1) never formally declaring the policy to be "final," and 2) threatening (but never actually initiating) enforcement procedures against companies which failed to comply with the agency's *de facto* policy. Indeed, this is precisely what plaintiff has alleged.

WLF's complaint alleges that the FDA has sought to enforce a final agency policy concerning manufacturer-supported dissemination of off-label usage information. With regard to manufacturers' distribution of "enduring materials" containing such information, WLF describes a number of different instances in which representatives of the FDA sent warning letters and followed up

with telephone calls to manufacturers which had planned to distribute medical textbooks and other enduring materials to doctors. In one such instance, WLF alleges that a pharmaceutical company which planned to distribute a standard oncology textbook (which included references to off-label uses of some of the company's products) to doctors was informed by a representative of the FDA that the company would have to include package inserts from each of the company's drugs that were mentioned in the textbook. In subsequent telephone calls, however, the FDA allegedly rescinded even this limited approval and stated that pharmaceutical companies would no longer be permitted to have any involvement in the distribution of medical textbooks in which off-label uses of their drugs were discussed. Compl. at ¶¶ 45–47. Companies attempting to support scientific and educational activities by providing information or samples of their products encountered similar warnings from representatives of the FDA. *E.g.,* Compl. ¶¶ 50–58.

In addition to sending warning letters to individual companies, high-ranking officers of the FDA are alleged to have made general remarks which plaintiff contends reveal the existence of a definitive agency position concerning off-label usage information. The Commissioner of the FDA himself, defendant David Kessler, allegedly made the following statement in June of 1991: "I would urge all members of the pharmaceutical industry to take a long hard look at their promotional practices. I do *not* expect companies to wait until this guidance becomes final to put their advertising and promotional houses in order." Compl. ¶ 53. More recently, David Adams, Director of the Policy Development and Coordination Staff in Commissioner Kessler's office is alleged to have written the following statement regarding the FDA's Draft Policy Statement:

> Although this document was published as a draft policy statement with an invitation to submit comments, *it reflects actual agency policy.* It tells you how the agency makes decisions from day to day in determining whether activities are subject to regulation and are potentially illegal under the Food, Drug and Cosmetic Act.

Pl.'s Opp. to Def.'s M.Dis. at 26 (quoting David Adams, "New Initiatives in FDA Advertising Policies," in *The Changing Face of FDA Advertising and Marketing Rules: An Executive Report,* (David Swit, ed. 1994)) (emphasis supplied). Other FDA officials are alleged to have made similar comments at various times. *Id.* at 26.

FDA maintains that these letters and comments do not amount to "final agency action." According to FDA, the "regulatory letters" described above merely "reflect views of particular individuals, not the institutional decision of the agency." Def's Mem.Supp.M.Dis. at 23. As such, defendants argue that this "informal advice given by specific employees of FDA" should not suggest the existence of any formal agency policy. *Id.* at 26. Likewise, because neither the Draft Policy Statement nor the comments of Commissioner Kessler constitute "coercive imperatives" which the FDA is bound to adhere to, *id* at 23, these are not evidence of a final policy either, according to FDA. Unfortunately, by focusing exclusively on the individual trees, FDA appears to have lost sight of the forest. The question here is not whether any single act on the part of the FDA signifies the existence of a final agency policy; rather, the aggregate effect of these acts must be analyzed to determine whether the agency by its conduct has objectively demonstrated the existence of such a policy. Once the agency "publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Ciba–Geigy,* 801 F.2d at 436. The allegations in the complaint suggest that FDA has done exactly this.

Although the FDA characterizes the "regulatory letters" and other statements of FDA officials as merely "advisory," the court must not be blind to the practical effects of these letters and other statements. As alleged in plaintiff's complaint, the collective effect of FDA's conduct has been to discourage manufacturers from disseminating information that they would otherwise have chosen to distribute. The result is that doctors, including WLF's member-doctors, have been pre-

vented from receiving information which they claim to have an interest in receiving. Contrary to FDA's protestations, the plaintiff's allegations clearly set forth a causal connection between FDA's conduct and the decision of various companies to stop disseminating certain kinds of information and to stop supporting certain scientific and educational activities.

It may be true, as FDA argues, that a company which disagrees with the "advice" contained in FDA's regulatory correspondence may disregard. this advice, go ahead with its planned activities, and then challenge the constitutionality of any adverse FDA action in an enforcement proceeding. However, the reality of the situation, as alleged by plaintiff, is that few if any companies are willing to directly challenge the FDA in this manner. In the first instance, the company must expose itself to the FDA's power to seize an entire product line if the FDA finds the products to be "misbranded." Although the company can then litigate the validity of the seizure (and therefore the policy pursuant to which the seizure was made), the prospect of lost sales and protracted litigation is understandably discouraging to these companies. In addition, the FDA wields enormous power over drug and medical device manufacturers through its power to grant or deny new product applications. It is evident that manufacturers are most reluctant to arouse the ire of such a powerful agency. The result, according to plaintiff, is that "FDA has been able to effectuate its policies without having to resort regularly to formal rulemaking." Pl.'s Opp. to Def.'s M.Dis. at 29. As evidence of this, the complaint describes a substantial reduction in the distribution of enduring materials to doctors and in the willingness of manufacturers to sponsor scientific and educational activities since the alleged implementation of FDA's off-label usage policy. These allegations portray the sort of "direct and immediate effect" which the *Ciba–Geigy* court found to be a useful indication of the finality of an agency position. *Ciba–Geigy*, 801 F.2d at 436.

Thus, the predicament faced by manufacturers wishing to sponsor activities or distribute· educational materials is a perfect ex-

ample of a situation in which "the affected person is confronted with the dilemma of choosing between disadvantageous compliance or risking imposition of serious penalties." *Ciba–Geigy*, at 434. Under such circumstances the presumption of reviewability attaches with particular force. *Id.* The fact that this suit is being brought by *doctors* who have been prevented from receiving information rather than the *manufacturers* with whose conduct the FDA policy primarily interferes lends further credence to plaintiff's contention that the FDA's power over industry is such that it is able to implement *de facto* regulatory policies without formally adopting final agency positions. As a general proposition, the court finds the possibility of such a practice disturbing; in the context of the plaintiff's constitutional allegations, the court finds the possibility of such a practice intolerable. Thus, the court concludes that the allegations contained in the plaintiff's amended complaint clearly raise a question of fact as to whether the FDA has been enforcing a *de facto* policy concerning manufacturer-supported distribution of off-label usage information.

In light of this conclusion, the court finds that the other two ripeness factors set forth in *Ciba–Geigy*, namely, whether the question presented is a purely legal one and whether consideration of the issue would benefit from a more concrete setting, support the court's determination that this dispute is ripe for review. First, although a determination on the merits will involve a factual inquiry as to whether plaintiff's allegations concerning FDA's conduct are true, it seems likely that the primary issues at to be decided will be 1) whether the FDA adopted a *de facto* policy concerning off-label usage; and 2) whether such policy was unconstitutional. These are primarily legal rather than factual issues. With regard to the second factor, it is hard to imagine a dispute that would not benefit from a more concrete setting; however, the court is not persuaded that this particular dispute is likely to become significantly more focused with time. Any marginal benefit which might be obtained by waiting for the FDA to *officially* adopt an off-label usage policy is more than offset by the serious First Amendment harms alleged by plaintiff.

The court is confident that the dispute presented by WLF is fit for judicial review under the standard set forth in the case law of this circuit; accordingly, defendants' motion to dismiss on ripeness grounds will be denied.

### C. Jurisdiction

■ Finally, FDA makes the curious argument that even if it has promulgated a policy which violates the First Amendment rights of manufacturers and doctors, this court lacks the power to declare such a policy unconstitutional or to enjoin defendants from enforcing it. FDA contends that WLF's suit "in essence" requests this court to enjoin future FDA enforcement actions, something the courts do not have jurisdiction to do. Again, the FDA is mistaken. WLF's complaint alleges that the FDA has adopted a final agency policy, and that this policy interferes with the constitutional rights of its members. The Supreme Court's decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 148, 87 S.Ct. 1507, 1511–12, 1515 (1967) clearly establishes that the courts have jurisdiction to review final agency policy and to order suitable relief in the event such policy is determined to be unlawful. FDA's argument that the court is without jurisdiction to order the relief sought by WLF is therefore rejected as well.

### III. Conclusion

For the reasons set forth herein, defendants' motion to dismiss will be denied. A separate Order shall issue this date.